Filed 10/6/23  P. v. Moulder CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Lassen)

----

| | |
|---|---|
| THE PEOPLE, | C096402 |
| Plaintiff and Respondent, | (Super. Ct. No. CR038228) |
| v. | |
| MARK ANTHONY MOULDER, | |
| Defendant and Appellant. | |

A jury found defendant Mark Anthony Moulder guilty of three counts of continuous sexual abuse of a child (Pen. Code, § 288.5, subd. (a))[1] and found true the special allegation that defendant committed a sex offense against more than one victim (§ 667.61, subds. (e)(4), (j)(2)).  The trial court imposed a sentence of three consecutive terms of 25 years to life in state prison.

On appeal, defendant contends that the trial court erred in ordering defendant to undergo HIV testing under section 1202.1, subdivisions (a) and (e)(5)(A)(iv), because

---

[1]    Undesignated statutory references are to the Penal Code.

1

there was insufficient evidence to support probable cause to believe that defendant's bodily fluids capable of transmitting the HIV virus came into contact with the children. The People agree, asserting that the appropriate remedy is remand to the trial court to give the prosecution an opportunity to present additional evidence. We will remand the case for that purpose. In addition, we will order the court to add one day to defendant's presentence credits. We otherwise affirm the judgment.

## FACTUAL BACKGROUND

Rikki D., the mother of V.S., became friends with defendant after they met at church. Rikki D. and her daughter V.S. moved in with defendant. Defendant acted in the role of father to Rikki D. and his relationship with V.S. was like a father or grandfather. Rikki D. moved out of defendant's house when she started dating someone and defendant began acting possessively. After that, Rikki D. lived off and on with a friend. Rikki D. then entered into a relationship with Dustin R., who himself had a daughter, H.R.

In 2020, when V.S. was eight, she would visit defendant at his home once or twice a week to play. Defendant regularly babysat two other girls, J.B. and M.B, and sometimes H.R.

When V.S. was at defendant's house, there were incidents where he touched her vagina. The touching started as tickling. When defendant tickled V.S., he would move his hands up and down her body toward her private parts. Defendant also touched her "back end" and her chest. Defendant touched V.S. over her clothes. These incidents happened almost every time V.S. went to defendant's house. Defendant sometimes ignored V.S.'s pleas to stop. These incidents made V.S. feel sad and mad. V.S. was afraid to tell anyone because defendant had guns.

Defendant took pictures and videos of V.S. One picture showed V.S. cooking in her bra. Other pictures showed her in the bath, doing a handstand in her underwear, and asleep in her mother's bed.

2

One evening when Rikki D. was at her friend's house bathing her younger child, she let V.S. go to defendant's house to shower. When Rikki D. and the friend went to get V.S., they found her completely naked sitting next to defendant on the couch. V.S. was startled, jumped up to grab a blanket and put it around herself, and sat back down next to defendant.

H.R.'s father, Dustin R., knew defendant from the neighborhood. During the pandemic, H.R. occasionally went to defendant's house to play with the other girls. At the house, defendant touched H.R. on her thigh, chest, and vagina. Defendant touched her vagina two or three times. He would start tickling her armpits and then tickle her down her body over her clothing. When defendant tickled H.R., she would try to get away from him. H.R. did not tell anyone because she was scared. H.R. was nine at the time of the offenses.

Melissa B. met defendant through Rikki D. Over the years, defendant became a close friend of Melissa B.'s family. In November 2019, defendant began providing childcare for Melissa B.'s daughters, J.B. and M.B., before and after school. When the pandemic began, they were at defendant's house four days a week. When J.B. was at defendant's house, defendant touched her on her upper chest and lower thigh. Defendant touched J.B. over her clothes with a flat hand on her chest and tickled her inner thigh just below the vaginal area. The incidents often happened while J.B. sat on the couch in the living room. Defendant came up behind her or sat next to her and began tickling her. J.B. tried to move away. The touching made her feel very uncomfortable and upset; she felt she was being harassed. J.B. told defendant to stop and sometimes he did. Defendant tickled J.B. more than five times. J.B. did not tell her mother because she was scared. J.B. was 10 at the time of the offenses.

V.S. saw defendant tickle J.B. and H.R. the same way he tickled her. Defendant tickled the girls' stomachs and then went up and down their bodies, including their private parts. Defendant tickled the girls almost every time they were at his house.

3

H.R. saw defendant tickle J.B., mostly on her vagina. H.R. saw defendant tickle V.S. occasionally.

J.B. saw defendant tickle V.S.'s inner thigh and chest but could not remember where defendant touched H.R. J.B. saw defendant touch V.S. more than five times. J.B. only saw defendant touching M.B. very minimally.

In late June or early July 2020, M.B. showed Melissa B. a video she made at defendant's house. The video showed M.B. dancing in the foreground and in the background defendant rubbing J.B.'s vagina over her clothing. Melissa B. told the other parents and together they called the sheriff's department.

In August 2020, Sergeant Ryan Ruano interviewed defendant. When informed of the allegations against him, defendant appeared shocked. Defendant confirmed that he was the man in the video, identified J.B. and M.B. as the young girls in the video, and knew their ages. Defendant admitted he was tickling J.B. and rubbing her vagina. Defendant stated that he tickled the girls' vaginas and breasts. Defendant said he touched J.B. only about three times. He believed she was forming an attraction to him. Defendant said J.B. came over in a robe with only a bra and panties underneath. J.B. said she had a boyfriend and was using defendant to make her boyfriend jealous. Defendant said J.B. told him she wanted to have sex with her boyfriend and he talked to her about sex. Defendant said J.B. instigated touching incidents by hitting his privates, so he would do it back to her.

Defendant initially denied but later admitted that he tickled H.R. like the other girls.

Defendant initially denied but later admitted he touched V.S. inappropriately five to six times over three to four months. His touching included rubbing her vagina, butt, and breasts. Defendant mentioned that V.S. would have a "great butt" when she got older and commented on her developing breasts. Defendant said he was initially a father figure to V.S. but the relationship turned into one of boyfriend and girlfriend. Defendant

4

believed V.S. was attracted to him and wanted to have sex with him. V.S. was the only female defendant had kissed since 2008. He kissed her on the lips. Defendant said it was nice to have a girl that cared for him, referring to V.S. Defendant called V.S. his girlfriend.

Defendant testified on his own behalf at trial. Defendant said he met Rikki D. at a recovery center at church when she came in with V.S. Rikki D. was being evicted so she moved in with defendant. Defendant took on the role of the father or grandfather figure to V.S., which Rikki D. encouraged. In August 2017, defendant moved with Rikki D. and V.S. to Rikki D.'s hometown. They lived happily together until Rikki D. began dating, was no longer sober, and became pregnant. Defendant wanted Rikki D. to move out because he had been sober for 30 years and was afraid Rikki D.'s behavior would affect his sobriety. Defendant asked Rikki D. to move out and she began to stay with a friend. Eventually Rikki D. moved in with a boyfriend, Dustin R.

Defendant recalled telling Sergeant Ruano that V.S. had a "big butt" that she waved in front of him. He did not recall saying that he touched V.S.'s breasts or vagina five to six times. Defendant recalled stating that V.S. often said she wanted to have sex before she was 10, but did not recall saying that V.S. "in her mind" was trying to have sex with him.

Defendant admitted taking a photo of V.S. cooking in the kitchen while wearing a bra. He also admitted taking a photo of a girl doing a handstand in her underwear with her nipples exposed.

When questioned about J.B., defendant did recall saying that J.B. was using him to make her boyfriend jealous, but did not recall saying that J.B. wanted to have sex with him.

Defendant admitted telling Sergeant Ruano he did not like H.R. because she might disrupt his relationship with V.S. He denied touching H.R. and said he avoided her.

5

Defendant said that when he was interviewed by Sergeant Ruano he was not thinking clearly, and this affected his ability to recall things at trial.

Defendant claimed he never touched any of the girls with sexual intent. He also did not take photos of the girls for sexual reasons. Defendant thought J.B. and V.S. exhibited oversexualized behavior, which concerned him. However, he did not tell the girls' parents of his concerns.

## DISCUSSION

### I

### *HIV Testing*

Defendant contends the trial court erred in ordering him to undergo HIV testing under section 1202.1. The parties agree, as do we, that there was insufficient evidence to support the order and the case should be remanded for the prosecution to present additional evidence. We will remand the case for that purpose.

Section 1202.1 provides that " 'the court shall order every person who is convicted of . . . a sexual offense listed in subdivision (e) . . . to submit to a blood . . . test for evidence of antibodies to the probable causative agent of acquired immune deficiency syndrome (AIDS) . . . .' " (*People v. Butler* (2003) 31 Cal.4th 1119, 1125 (*Butler*), quoting § 1202.1, subd. (a); see also *People v. Stowell* (2003) 31 Cal.4th 1107, 1112.) The term "sexual offense" includes section 288.5 (§ 1202.1, subd. (e)(5)(A)(iv)), but the statute authorizes an HIV testing order for that offense[2] only "if the court finds that there is probable cause to believe that blood, semen, or any other bodily fluid capable of transmitting HIV has been transferred from the defendant to the victim: [¶] . . . [¶] For

---

[2] A showing of probable cause is not required to order HIV testing where the defendant is convicted of rape, unlawful intercourse with a minor under age 18, sodomy, or oral copulation. (§ 1202.1, subd. (e)(1)-(4).)

purposes of this paragraph, the court shall note its finding on the court docket and minute order if one is prepared." (§ 1202.1, subd. (e)(5)(A), (B).)[3]

Here, as in *Butler*, the trial court ordered HIV testing but did not make a finding of probable cause and enter an appropriate notation in the docket or a minute order. (*Butler, supra*, 31 Cal.4th at p. 1125.) "[I]f the trial court orders testing without articulating its reasons on the record, the appellate court will presume an implied finding of probable cause." (*Id.* at p. 1127.) "Probable cause is an objective legal standard," which under section 1202.1 means "whether the facts known would lead a person of ordinary care and prudence to entertain an honest and strong belief that blood, semen, or any other bodily fluid capable of transmitting HIV has been transmitted from the defendant to the victim." (*Ibid.*) "[B]ecause the terms of the statute condition imposition on the existence of probable cause, the appellate court can sustain the order only if it finds evidentiary support, which it can do simply from examining the record." (*Ibid.*)

The existence vel non of probable cause as shown in the record is one of law, which we review de novo. (*Butler, supra*, 31 Cal.4th at p. 1127.)

Accordingly, we examine the record de novo to determine whether there is sufficient evidence to support an implied finding of probable cause to believe that bodily fluids capable of transmitting HIV were transferred from defendant to the victims. We conclude there is not. The evidence of defendant's crimes consists of his using his hands to tickle, touch, and rub the breast, buttocks, or vagina of the victims over their clothes. Defendant admitted kissing V.S. but described it as the type of kiss a daughter would

---

[3] Defendant did not object to the order. The general rule that points not urged in the trial court cannot be raised on appeal does not apply to an HIV testing order. (*Butler, supra*, 31 Cal.4th at p. 1126.) "[S]ince involuntary HIV testing is strictly limited by statute and Penal Code section 1202.1 conditions a testing order upon a finding of probable cause, a defendant may challenge the sufficiency of the evidence even in the absence of an objection." (*Id.* at p. 1123.)

7

give her father, i.e., not a kiss where defendant's saliva would be transferred to V.S. In the incident where Rikki D. surprised V.S. sitting naked on the couch next to defendant, there was no indication that he was touching V.S. in a way that would transmit bodily fluids or even touching her at all. Any assertion that acts other than those shown by the trial evidence involved the exchange of bodily fluids is insufficient to support a finding of probable cause. (*People v. Guardado* (1995) 40 Cal.App.4th 757, 765; see also *Butler, supra*, 31 Cal.4th at p. 1127 ["even if the prosecution *could have* established probable cause, in the absence of sufficient evidence *in the record*, the order is fatally compromised"].)

As the California Supreme Court observed in *Butler*, "[t]he question remains whether any remedy should be available when a defendant successfully challenges an HIV testing order for insufficiency of the evidence of probable cause." (*Butler, supra*, 31 Cal.4th at p. 1129.) Our high court held that, given the serious health consequences of HIV infection, the order directing HIV testing should not simply be stricken. (*Ibid.*) Rather, the case should be remanded for further proceedings at the election of the prosecution to present additional evidence of potential transmission. (*Ibid.*)

Accordingly, we will remand for the trial court to conduct further proceedings under section 1202.1 if the prosecution so chooses. We express no view as to whether sufficient evidence may exist to support a finding of probable cause.

II

*Presentence Credit*

The parties agree—again, as do we—that defendant received 90 days of presentence conduct credit when he should have received 91 days.

"A defendant is entitled to actual custody credit for 'all days of custody' in county jail and residential treatment facilities, including partial days." (*People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 48, quoting § 2900.5, subd. (a).) A convicted defendant is also entitled to presentence conduct credit for good time and worktime under section

8

4019. (*People v. Dieck* (2009) 46 Cal.4th 934, 939; *Rajanayagam*, at p. 48.) For a person convicted of a felony listed in section 667.5, subdivision (c), as here, conduct credit is limited to 15 percent of custody credit. (§§ 667.5, subd. (c)(17), 2933.1, subd. (a); see also *People v. Brewer* (2011) 192 Cal.App.4th 457, 462 [a defendant convicted for violating § 288.5 is entitled to conduct credit of 15 percent of actual custody days].)

At the sentencing hearing, the trial court correctly awarded defendant 609 days of actual custody credit. However, the court miscalculated the conduct credit award as 90 days. Fifteen percent of 609 is 91.35. Rounded down to a whole number, defendant is entitled to 91 days of conduct credit, for a total presentence credit award of 700 days.

We will direct the trial court to amend the abstract of judgment to award defendant 91 days of presentence conduct credits and 700 days total.

## DISPOSITION

The trial court's HIV testing order is reversed and the matter is remanded to the trial court with directions to permit the prosecution to offer evidence to support an HIV testing order. We modify the judgment to reflect that defendant has 700 days of presentence custody credit, consisting of 609 days in actual custody and 91 days of conduct credit. The trial court is directed to prepare an amended abstract of judgment reflecting this modification and forward a copy to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

/s/

EARL, P. J.

We concur:

/s/

HULL, J.

/s/

ROBIE, J.

9